J-A13036-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF NAOMI R. CHERUP, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: DAVID G. CHERUP | : | |
| | : No. 480 WDA 2025 | |

Appeal from the Order Entered April 16, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: 02-15-4102

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: June 30, 2026**

David G. Cherup (Appellant) appeals from the orphans' court's invalidation of the March 26, 2012 Last Will and Testament (2012 Will) of his mother, Naomi R. Cherup (Decedent), and the reversal of the revocation of Decedent's November 5, 2008 Last Will and Testament (2008 Will).  After careful consideration, we affirm.

*Introduction*

Decedent died at the age of 92 on June 21, 2015.  Her heirs are her three adult children: Appellant and two daughters, Lori L. Cherup (Lori) and Lisa A. Cherup (Lisa).[1]  Decedent lived in her home in Upper St. Clair, Pennsylvania, from 1964 until her death in 2015.  N.T., 2/11/19, at 6. Appellant moved in with Decedent in August 2009.  *Id.* at 8.  Lori also lived,

---

[1] We refer to the daughters by their first names because they have the same last name.

and continues to live, in Upper St. Clair, while Lisa lived, and continues to live, in Virginia. *Id.* at 7-8.

The three siblings are individual parties to this action and have separate counsel. Lori and Lisa agree that Lisa properly submitted the 2008 Will for probate, while Appellant claims that the 2012 Will should be probated. Both wills incorporate trust agreements. *See* 2008 Will at Art. IV (referring to the "Revocable Trust Agreement … of even date herewith"); 2012 Will at Art. II (referring to the "Irrevocable Trust under agreement dated as of March 26, 2012"). The orphans' court explained:

> The 2008 Will and Revocable Trust, in essence, provides for dividing the Decedent's estate in three equal shares—33 1/3% to each of the three children, with a provision providing that advancements to the children during Decedent's lifetime be accounted for in calculating their shares. The 2012 Will and Irrevocable Trust, in essence, provides for Lori to receive 33%, Lisa to receive 42%, and [Appellant] to receive the Decedent's residence plus 25%. Advancements are not taken into account. As there was no testimony regarding the fair market value of the residence, it cannot be determined whether adding the fair market value of the residence to [Appellant's] 25% would result in him receiving more than 33 1/3%, as set forth in the 2008 Will. However, the elimination of consideration of [Appellant's] receipt of $1.6 million in advancements would result in a windfall to him under the 2012 Will.

Orphans' Court Opinion (OCO), 5/9/25, at 17-18.

*Procedural History*

The procedural history of this case is convoluted and unusual. On August 10, 2015, Lisa filed a petition for probate of the 2008 Will, and the

orphans' court issued testamentary letters to her as executrix.[2] On September 1, 2015, Appellant filed a petition to probate the 2012 Will on the basis that the 2012 Will revoked the 2008 Will.[3] On September 30, 2015, Lisa filed an answer and new matter claiming that Decedent lacked testamentary capacity to execute the 2012 Will, and that the 2012 Will was the product of Appellant's undue influence. The parties have disputed the validity of the two wills for more than a decade.

As the orphans' court noted, "litigation between these parties actually began in mid-2012, when Lori filed a Petition for the Appointment of a Guardian for the Decedent, which resulted in the appointment of a Limited Guardian of the Person and a separate Limited Guardian of the Estate."[4] OCO at 1 n.1. The court further observed:

> This case [involving the validity of Decedent's wills] has an incredibly long and tortured history, including almost 200 docket entries.[5] Delays were caused by an appeal to the Superior Court [in 2016], which was quashed as interlocutory, an 8-day hearing

---

[2] The 2008 Will appointed Decedent's "daughters, Lisa [] and Lori [], and the survivor of them, Executor of this Will." 2008 Will at Art. V. Lori renounced her role "in favor of the other co-executrix." Renunciation, 8/10/15.

[3] The 2012 Will appointed Appellant as executor, and alternatively appointed Lori in the event Appellant "is unable or unwilling to serve or continue to serve," and Lisa, if Lori "is unable or unwilling to serve or continue to serve." 2012 Will at Art. V.

[4] The orphans' court appointed Decedent's brother, Samual Glenn Rankin, M.D., as limited guardian of her person, and Smithfield Trust Company as limited guardian of her estate.

[5] The certified record shows there are now 213 docket entries.

- 3 -

before the Hearing Officer that incredibly spanned a period of almost two years, an inexcusable 14-month wait for the Hearing Officer to issue his decision, and the utter failure of a previously assigned Judge to render a decision on an appeal.

*Id.* at 1.

A total of five orphans' court judges have been assigned to the will dispute. The current assigned judge, the Honorable Susan Evashavik DiLucente,[6] detailed the chronology, which is pertinent to our review, as follows:

> While [Appellant's p]etition [to probate the 2012 Will] and [Lisa's a]nswer [and new matter] were pending, on March 8, 2016, Lisa filed a Petition for a Rule to [Appellant] … requesting that [he] file an Account and that he return certain personal property and financial records belonging to the Decedent. [Appellant] responded by filing Preliminary Objections, which were ultimately dismissed, and [he] was ordered to file an Account, which was filed on May 6, 2016 listing $0 in receipts, income, expenses, disbursements, and distributions.
>
> While both of these Petitions were pending, an appeal was filed [by Lisa] to the Superior Court in March 2016 on an unrelated issue. The appeal … was quashed … as interlocutory on May 22, 2017.
>
> Apparently believing that his initial Petition … was insufficient, on March 30, 2016, [Appellant] filed a Petition for Citation to Show Cause Why the [2012] Will … Should Not be Admitted to Probate and Why the Letters Testamentary Issued to Lisa … Should not be Revoked. On May 6, 2016, Lisa filed … "Preliminary Objections Raising Issues of Fact to Late Filed and Duplicate Petition to Probate [2012] Will." In a Register's Order dated June 16, 2016,

_____

[6] President Judge Evashavik DiLucente began serving as President Judge of the Allegheny County Court of Common Pleas in January 2024. The Pennsylvania Supreme Court assigned her to "the Orphans' Court Division of the Court of Common Pleas of Allegheny County … effective January 7, 2025." Order 12/6/24.

- 4 -

the Preliminary Objections were sustained [because Appellant's] earlier Petition was already pending.

A second Register's Order was issued on June 16, 2016, setting forth a discovery deadline and directing the filing of Pretrial Statements. The discovery deadline was continued, along with the date for filing Pretrial Statements.

On November 21, 2016, [Appellant] filed a Notice of Appeal [to the orphans' court pursuant to 20 Pa.C.S. §§ 711(18) and 908,] appealing the decision of the Department of Court Records to admit to probate the [2008] Will. [However, the appeal was filed after the expiration of the one-year appeal period set forth in 20 Pa.C.S. § 908]. On the same day, [Appellant] filed a Petition for Citation to Show Cause Why the Letters Testamentary Issued to Lisa [] Should not be Revoked on the Basis of Fraud Perpetrated Upon the Register of Wills. The Petition was denied on March 31, 2017, as the issue … was within the sole purview of the Register of Wills and the matter was pending before that Office.

A Hearing before Hearing Officer Timothy Finnerty, Esquire, … commenced on September 19, 2017. It continued on November 2-3, 2017, December 10, 2018, February 11, 2019, March 26-27, 2019, and July 10, 2019—a period of almost two (2) years. During this time period, on August 27, 2019, the case was assigned to the Honorable Joseph Williams due to the retirement of [the first assigned judge, the Honorable Kathleen] Durkin.

… Hearing Officer Finnerty finally issued his Opinion and Order of Court on December 3, 2020—more than a year later. Per the Register's Order, the probate of the [] 2008 Will was revoked and the [] 2012 Will was admitted to probate upon proper application. In his Opinion, Hearing Officer Finnerty addressed the following issues: (1) Did the Decedent have testamentary capacity on March 12, 2012?, (2) If testamentary capacity is found, was the [] 2012 Will the product of undue influence?, and (3) Was a fraud committed upon the DCR-Wills/Orphans' Division by Lisa … when she probated [the 2008] Will … knowing that there were later Wills executed by the Decedent?.

With regard to the issue of testamentary capacity, the Hearing Officer found as follows: First, the Decedent had testamentary capacity on March 26, 2012, which he noted "is different from a weakened intellect." Second, the testimony of Bruce Wright,

M.D.[7] was "unconvincing as to the time frame of March 26, 2012." Third, the testimony of Carol Myron, M.D., the Decedent's treating physician, who testified that the Decedent's health decline was "gradual" between the dates of the Wills at issue (*i.e.*, November 5, 2008 and March 12, 2012) directly contradicted the testimony of Lisa that all of the Wills executed by the Decedent after the 2008 Will were the product of undue influence or that the Decedent lacked testamentary capacity when the later Wills were drafted. Fourth, the testimony of Attorney Jeffrey Morella, Esquire, scrivener of the 2012 documents, was credible. Thus, the Hearing Officer found that Lisa and Lori failed to show by clear and convincing evidence that the Decedent lacked testamentary capacity on March 26, 2012.

With regard to the issue of whether the 2012 Will was the product of undue influence, based upon the three-prong test in *Matter of Estate of Ross*, 462 A.2d 780 (Pa. Super. 1983), the Hearing Officer found as follows: First, the Decedent suffered from a "weakened intellect" due to her medical and cognitive difficulties, along with the fact that she "was almost totally dependent on [Appellant] for all aspects of her life." Second, a "confidential relationship" existed between the Decedent and [Appellant], in that [Appellant] "had his attorney go to the [Decedent's] home," revoke the power of attorney she had given to Lori and Lisa, and "had her sign a power of attorney to [Appellant]." Further, [Appellant] "used his mother's money, house and car as his," took her out to dinner (at her expense) five to six nights a week, and limited her access to others by changing her phone number and the locks on her house. As to the third prong of the test, the Hearing Officer found the evidence did not demonstrate that [Appellant] would receive a "substantial benefit" under the 2012 Will over the 2008 Will. As such, the Hearing Officer found that Lori and Lisa had failed to prove the 2012 Will was the product of undue influence.

With regard to the issue of whether Lisa committed fraud, the Hearing Officer found that Lisa probated the 2008 Will "knowing that it was not the Decedent's Last Will and Testament." He made no specific findings regarding fraud.

_____

[7] The orphans' court noted that the Hearing Officer referred to Dr. Wright as a "psychologist[, when i]n fact, he is a psychiatrist." OCO at 4 n.3. Appellant also identifies Dr. Wright as a psychologist. *See* Appellant's Brief at 41.

On January 19, 2021, Lori filed a Petition for Citation Sur Appeal from Probate Pursuant to [20 Pa.C.S. §] 908, … and on February 8, 2021, Lisa filed a Petition Appealing Register's Order of December 3, 2020 and Joinder in Pending Appeal of Lori []. [Appellant] filed Answers to both Petitions. After a status conference with Judge Williams, with the consent of all counsel to the appointment of a third-party Administrator, Dale Frayer, Esquire was designated as the Administrator of the Estate.

On May 7, 2021, Judge Williams issued an Order stating that the outstanding issues would be adjudicated in July 2021. The Order further directed counsel to file Briefs summarizing the disputes, listing witnesses and exhibits, and setting forth the legal issues with case law or statutory citations. Instead of moving forward with the July hearing, Judge Williams, *sua sponte*, in an Order dated June 24, 2021, directed the parties to participate in mediation.

Per Order dated August 6, 2021, Lori was permitted to withdraw her appeal, with the litigation continuing between Lisa and [Appellant].

As mediation was unsuccessful, Judge Williams issued an Order scheduling a Pretrial Conference for November 10, 2021 and a trial for November 16, 17, and 18, 2021. After the Pretrial Conference, in an Order dated November 12, 2021, Judge Williams, with consent of the parties and counsel, canceled the trial with the agreement that he would issue a decision on the basis of the testimony and exhibits presented to the Hearing Officer, along with suggested Findings of Fact/Conclusions of Law and arguments to be submitted by counsel. The Order further stated: "Upon submission, the [orphans' c]ourt will then be taxed with making the various fact and legal decisions associated with this will contest." The Order also stayed the appointment of the Administrator (Dale Frayer, Esquire) pending further Order. Counsel filed the required submissions on December 30, 2021.

Judge Williams took no action on the case from that date—December 30, 2021—until August 30, 2024, the day before his retirement, when he issued an Opinion affirming the decision of the Hearing Officer. In his Opinion, Judge Williams found that he had jurisdiction under the statute and set forth the standard of review as "*de novo*." Judge Williams then went on to express that his *de novo* review was hampered by the decision of counsel to rest "on the record made before the Register of Wills Hearing

Officer, Mr. Finnerty." Judge Williams stated that he anticipated making credibility determinations of the witnesses when he heard their testimony live, but he "did not get that opportunity." He stated: "It's a little tough, if not darn near impossible, to make credibility determinations from a warm piece of 8½ by 11 paper." As a result of that "limitation," Judge Williams affirmed the decision of the Hearing Officer.

Lisa filed a Motion for Reconsideration on September 5, 2024, which was addressed by the Honorable Lawerence J. O'Toole, the-then, now retired Administrative Judge of the Orphans' Court Division in an Order dated September 10, 2024. The Order granted Reconsideration and vacated the Opinion and Order filed by Judge Williams. Upon Judge O'Toole's retirement, the case was reassigned to the Honorable Michael McCarthy. Pursuant to a recent Order, the matter [was] reassigned to [President Judge Evashavik DiLucente].

*Id.* at 2-7 (footnotes omitted).

President Judge Evashavik DiLucente reviewed "the hundreds of pages of testimony, along with the numerous pleadings filed by the parties,[8] and the decision of the Hearing Officer."[9] *Id.* at 8. On March 24, 2025, she entered an opinion and order finding that Decedent lacked testamentary capacity when she executed the 2012 Will. Accordingly, she concluded that the 2012 Will was invalid, and reversed the revocation of the 2008 Will. President Judge

---

[8] The record contains more than 100 exhibits.

[9] President Judge Evashavik DiLucente noted she was "mandated … to conduct a proper review of the Hearing Officer's decision." *Id.* at 9. She stated that "neither Judge Williams nor his staff ever obtained the complete court record or any of the transcripts from the Department of Court Records," and reiterated that the "responsibility of a Judge on an appeal from the decision of a Hearing Officer requires that he or she review the pleadings and prior Orders, read the hearing transcripts, and examine the admitted Exhibits." *Id.*

Evashavik DiLucente also directed that the appointed administrator, Dale Frayer, Esquire, proceed with administering the estate.

Appellant filed a notice of appeal on March 28, 2025. However, this Court quashed the appeal because Lisa had filed a motion for reconsideration which was "expressly granted." **See** Order, 7/1/25 (stating that the appeal had "been rendered inoperative."). On April 16, 2025, President Judge Evashavik DiLucente entered an order vacating the provision of the March 24, 2025 order which directed Attorney Frayer to administer the estate, and instructed the Director of Wills to reissue letters testamentary to Lisa "as executrix pursuant to the [2008] Will." Order, 4/16/25. The April 16, 2025 order stated that the March 24, 2025 order was otherwise "unchanged." **Id.** On April 22, 2025, Appellant filed a notice of appeal.[10]

Appellant presents the following questions for review:

I - DID THE [ORPHANS'] COURT ERR IN REVERSING THE REVOCATION OF THE [] 2008 WILL OF [DECEDENT]?

II - DID THE [ORPHANS'] COURT ERR IN FINDING THAT IT WAS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE DECEDENT LACKED TESTAMENTARY CAPACITY AT THE TIME SHE EXECUTED THE [] 2012 WILL AND IN DELCARING [sic] SUCH WILL INVALID?

---

[10] While Appellant's March 28, 2025 appeal was pending, he filed a court-ordered concise statement pursuant to Pa.R.A.P. 1925(b). He was not ordered to file a concise statement after he filed the April 22, 2025 appeal. The orphans' court noted that the previously filed concise statement was "anything but concise. It claims nineteen (19) separate errors over seven (7) pages, with numerous partial and run-on sentences. Per Pa.R.A.P. 1925(b)(4)(iv), 'the Statement should not be redundant or provide lengthy explanations as to any error.'" OCO at 8.

III - DID THE [ORPHANS'] COURT ERR IN FAILING TO FIND THAT, AS A MATTER OF LAW, THE [] 2012 WILL WAS NOT THE PRODUCT OF UNDUE INFLUENCE BY [APPELLANT]?

IV - DID THE [ORPHANS'] COURT ERR IN FINDING THAT LISA [] DID NOT COMMIT A FRAUD ON THE REGISTER OF WILLS WHEN SHE PROBATED THE 2008 WILL, KNOWING THAT THERE WERE LATER WILLS EXECUTED BY THE DECEDENT WHICH, ON THEIR FACE, REVOKED ALL PRIOR LAST WILLS AND TESTAMENTS?

Appellant's Brief at 6.

*Discussion*

Initially, we recognize that in a will contest, this Court "will not lightly find reversible error" and will reverse the orphans' court's decision "only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record." ***In re Est. of Byerley***, 284 A.3d 1225, 1236 (Pa. Super. 2022) (citation omitted).

> The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [orphans'] court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

***In re Estate of Schumacher***, 133 A.3d 45, 49–50 (Pa. Super. 2016) (citation omitted).

*1. Reversal of the Revocation of the 2008 Will*

Appellant first argues that the orphans' court erred in reversing the revocation of the 2008 Will based on evidence of a third will dated February 4, 2010 (2010 Will). Appellant claims the "2008 Will was obviously executed

prior in time to the [] 2010 Will and was expressly revoked by the [] 2010 Will." Appellant's Brief at 32. According to Appellant, the orphans' court "completely disregard[ed] Appellant's Exhibit 1, the [] 2010 Will of [Decedent], which on its face revokes all previous Last Wills and Testaments." *Id.* Appellant states:

> A review of the [orphans' c]ourt's Opinion shows that the [orphans' c]ourt mentions Exhibit 1, but completely disregards and does not discuss the effect of the [] 2010 Will on the [] 2008 Will offered for probate by Lisa. This is because the [orphans' court] never had a copy of any of the Exhibits entered into evidence at the hearings, including Exhibit 1. Instead, the [orphans' c]ourt performed an irrelevant and incorrect analysis of both [Appellant's] argument for revocation of the [] 2008 Will by later Wills, specifically the [] 2010 Will[,] and by mischaracterizing that argument as involving Lisa's fraud against the Register of Wills, which is a wholly separate issue. In completely discounting Exhibit 1, the [] 2010 Will, and its effect of revoking all prior wills, which would include the [] 2008 Will, the [orphans' c]ourt committed reversable error.

*Id.* at 32-33 (citations to reproduced record omitted).

Appellant's argument is unavailing. There is no support for his claim that the orphans' court "never had a copy of any of the Exhibits entered into evidence at the hearings, including Exhibit 1." *Id.* at 32. To the contrary, the orphans' court emphasized its "responsibility … to examine the admitted … written Exhibits, of which there were more than a hundred in this 8-day hearing." OCO at 9; *see also id.* at 18-19 (discussing Lisa's "secondhand knowledge" of the 2010 Will).

Furthermore, Appellant failed to raise the issue of the 2010 Will's validity within one year of Lisa receiving testamentary letters for probate of the 2008

Will.  *See* 20 Pa.C.S. § 908(a) (providing a party "seeking to challenge the probate of a will or who is otherwise aggrieved by a decree of the register … may appeal therefrom to the court within one year."). Appellant relied on the 2012 Will to challenge the 2008 Will. Thus, we agree with Lori's argument that Appellant "waived any claim that the 2008 Will was revoked by a subsequent will in 2010." Lori's Brief at 29. As Appellant did not timely assert that the 2010 Will revoked the 2008 Will, the issue is waived. We reject Appellant's claim that the existence of the 2010 Will precluded the orphans' court from reversing the revocation of the 2008 Will.

*2. Testamentary Capacity*

Appellant next challenges the orphans' court's determination that the 2012 Will was invalid because Decedent lacked testamentary capacity. This Court has explained:

> Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease. Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property. In determining testamentary capacity, a greater degree of proof of mental incapacity is required than would be necessary to show the inability to conduct one's business affairs. Finally, testamentary capacity is to be ascertained as of the date of execution of the contested document.

*In re Staico*, 143 A.3d 983, 989 (Pa. Super. 2016) (citation omitted).

Appellant argues "none of the testimony or exhibits adduced at the Hearing established by clear and convincing evidence that [Decedent] lacked

- 12 -

testamentary capacity on March 26, 2012, the date the [2012] Will … was executed." Appellant's Brief at 30. According to Appellant, "the testimony of the scrivener of the [2012] Will, [Attorney] Morella, supports Decedent's testamentary capacity as of the date the Will in question was signed. [Attorney] Morella's testimony and the exhibits he testified about were capriciously disbelieved or disregarded by the [orphans' c]ourt." *Id.* Appellant also assails the medical testimony presented by Lori and Lisa from the psychiatrist, Dr. Wright, and Decedent's treating physician, Dr. Myron. *Id.* at 41-51. Appellant's argument does not merit relief.

The orphans' court credited the testimony of Dr. Wright and Dr. Myron, noting that their testimony was "the only medical testimony offered in this case." OCO at 10; *id.* (observing Appellant "did not offer any medical testimony, nor did he testify himself; instead, he relied on the cross-examination of the medical experts and his sisters."). The orphans' court explained:

> [Dr. Wright] stated that he reviewed, *inter alia*, the Decedent's medical and pharmaceutical records, St. Clair Hospital records, ophthalmologist records, Dr. Myron's records, transcripts of the guardianship proceedings, and the reports of the two medical experts that testified at the guardianship hearing. He also evaluated the Decedent in person on February 11, 2015. Dr. Wright opined that the Decedent's capacity to effectively remember, understand, analyze and evaluate information and make reasoned decisions was impaired on March 26, 2012. Most significant, in his opinion, was her short-term memory problems, which he stated would make her susceptible to influence and dependent on others. He also noted that she would have been "impaired" in 2011 leading up to March 26, 2012. (N.T. 11/2-3/17, pp. 181-182). He stated that the Decedent could not

- 13 -

effectively manage her own finances in 2011-2012. Finally, he opined that the Decedent was unable on March 26, 2012, to understand the estate planning documents, which was not a reading or hearing problem, but rather a processing problem. (N.T. 11/2-3/17, pp. 191-192).

*Id.* at 10-11.

The orphans' court remarked that "unless a person suffers a specific medical event affecting his/her cognitive ability (*e.g.*, a stroke, a traumatic brain injury, etc.), it is nearly impossible to pinpoint an exact date when a person loses testamentary capacity." *Id.* at 12. The court found Decedent's "medical records demonstrate that there was not a particular event in the Decedent's medical history, but rather a decline of her cognitive abilities over a series of months." *Id.* at 13. The court also recounted the testimony from Dr. Myron:

[Dr. Myron] stated that she met the Decedent on April 10, 2008 for a pre-op exam[, and saw her on July 16, 2008 for a post-op exam]. She saw the Decedent two years later on March 31, 2010, when [Appellant] brought her in for an exam, stating that she "can't think well." At that time, Dr. Myron administered the MMSE[11]. The Decedent scored 27/30, with the three missed questions involving recall/memory. Thereafter, she followed the Decedent for memory issues. The MMSE administered in October 2011 resulted in a score of 24/30 and the MMSE administered on March 14, 2012 (12 days prior to the execution of the 2012 Will) resulted in a score of 22/30. On each of these tests, the Decedent missed the same three questions regarding recall/memory, plus additional questions. According to Dr. Myron, in 2011-2012, the Decedent's memory loss was "severe." Further, her memory and

_____

[11] Dr. Myron testified that MMSE stands for "Mini Mental Status Exam," which "tests different areas of cognition, language, attention, calculation, recall [and] some other things." N.T., 11/3/17, at 294. Dr. Myron stated that she administered the MMSE on March 31, 2010, "because of the concern about [Decedent's] memory." *Id.*

- 14 -

cognition never improved, but rather consistently declined. While the Decedent understood that she had high blood pressure and anxiety, she did not necessarily understand that she had memory loss. Dr. Myron specifically testified that the Decedent could not understand the terms of the March 26, 2012 Will because her cognition was impaired to the extent that she could not comprehend the details of the Will, even if someone read it to her. Dr. Myron also testified that the Decedent was susceptible to influence in 2011 because she was impaired in her ability to make decisions and had to rely on others, which continued into 2012, including March 26, 2012. With regard to the "nature and value of her estate," Dr. Myron opined that she could not comprehend this information due to her short-term memory deficits. (N.T. 11/2-3/17, pp. 292-351).

*Id.* at 13-14. The orphans' court noted that "the MMSE exams were only one factor contributing to Dr. Myron's diagnosis. She also considered her personal examination of the Decedent, along with information provided by the Decedent's children, including [Appellant], when they accompanied the Decedent to her appointments." *Id.* at 14.

The testimony of Dr. Wright and Dr. Myron supports the orphans' court's finding that Decedent lacked "intelligent knowledge of the natural objects of h[er] bounty, the general composition of h[er] estate, and what … she want[ed] done with it." *In re Staico*, 143 A.3d at 989. Consequently, the orphans' court did not err in concluding that Decedent lacked testamentary capacity when she executed the 2012 Will. Appellant's argument fails because he asks this Court to consider the evidence in his favor, but that is not our role. We must defer to the orphans' court's findings, and we may not reweigh the evidence or disturb the orphans' court's credibility determinations. *See Schumacher*, 133 A.3d at 49-50.

- 15 -

### 3. *Undue Influence*

In his third issue, Appellant argues:

> The [orphans' c]ourt also committed an error of law [by] finding that the [] 2012 Will was the product of undue influence by [Appellant], when it was not proven that [he] received the bulk of [the Decedent's] estate. The [orphans' c]ourt capriciously disregarded competent evidence when it determined [Appellant] received a substantial benefit in [the Decedent's] estate by ignoring the share [he] would have received in all of [the Decedent's] estate plans since June 17, 2010[,] and instead in focusing on [Appellant's] share of the estate in the [] 2008 Will, which had been clearly revoked.

Appellant's Brief at 30-31.

This argument also lacks merit. "Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises." *In re Staico,* 143 A.3d at 990 (citation omitted). Here, Appellant failed to establish the proper execution of the 2012 Will. As discussed above, the orphans' court invalidated the 2012 Will based on Decedent's lack of testamentary capacity. Therefore, we need not consider whether the 2012 Will was the result of undue influence. *See* OCO at 17 (finding Decedent's lack of testamentary capacity rendered "the issue of undue influence … irrelevant.").

However, if we were to consider the issue, we would find that the record supports the orphans' court's alternative determination that the 2012 Will was the product of Appellant's undue influence. A party claiming undue influence must establish, by clear and convincing evidence: (1) that the testator was of weakened intellect when the will was executed, and (2) that a person in a

- 16 -

confidential relationship with the testator (3) receives a substantial benefit under the disputed will. ***Schumacher***, 133 A.3d at 52. Undue influence "is generally accomplished by a gradual, progressive inculcation of a receptive mind," and "the 'fruits' of the undue influence may not appear until long after the weakened intellect has been played upon." ***Id.*** (citation omitted).

Here, the orphans' court stated, "Dr. Myron credibly opined that the Decedent could not understand the terms of the 2012 Will, could not comprehend the nature and value of her estate, was impaired in her ability to make decisions, and **was susceptible to influence**." OCO at 16 (emphasis added). The orphans' court also "agree[d] with the Hearing Officer that the Decedent had a weakened intellect and that she and [Appellant] had a confidential relationship." ***Id.*** at 17. Concerning whether Appellant would receive a substantial benefit, the orphans' court explained:

> The Hearing Officer answered this question in the affirmative more than once on the record at the hearing. In addition, [Appellant] conceded that he had no evidence whatsoever to rebut the presumption that the 2012 Will provided him with a substantial benefit. Although the Hearing Officer stated this fact on the record, in his written opinion, he relied upon Attorney Morella's testimony that there was no significant change in distribution between the two wills. The evidence belies this written assertion and supports the oral finding of the Hearing Officer.

***Id.*** (citations omitted).[12]

---

[12] The Hearing Officer answered affirmatively when Appellant's counsel asked, "Do you find [Lori and Lisa] have shown by clear and convincing evidence … the three elements of undue influence?" N.T., 3/26/19, at 172. The Hearing Office subsequently remarked, "I've already made a ruling on that, I feel he did get a substantial benefit." ***Id.*** at 291.

The orphans' court specifically found that Appellant's "receipt of $1.6 million in advancements would result in a windfall to him under the 2012 Will." *Id.* at 18. Accordingly, we find no merit to Appellant's argument regarding undue influence.

*4. Fraud and the Probate of the 2008 Will*

Finally, Appellant argues that Lisa committed fraud on the court by probating the 2008 Will while knowing that Decedent had executed subsequent wills. Appellant argues:

> The [orphans' c]ourt completely disregarded Lisa's testimony that she received copies of at least one other of [Decedent's] Wills prior to her death and that she received and read copies of all of [Decedent's] estate plans while the underlying litigation was going on. The [orphans' c]ourt also ignored Lisa's admission that she joined in the Guardianship Petition and thus had constructive knowledge, at the very least, of the existence of the [] 2010 Will … and the Judicial Admission that she and her sister, Lori, asserted to the [c]ourt that the [] 2010 Will was the final Will executed by [Decedent] that was not the product of undue influence.

Appellant's Brief at 59-60 (citations to reproduced record omitted).

In response, Lisa emphasizes her limited knowledge of any "testamentary writings" prepared for Decedent after 2008. *See* Lisa's Amended Brief at 52. Lisa states that aside from the 2012 Will, she was not provided with any copies, and she believed the 2012 Will to be the product of Appellant's undue influence. *Id.* According to Lisa, she lacked "the practical ability to establish the existence of or approve the validity of such a document in this matter, considering the circumstances surrounding the last years of [Decedent's] life, [Appellant's] overarching control over every aspect of

[Decedent's] personal and financial affairs, and [his] animosity towards Lisa and Lori." *Id.* at 52-53. Lisa asserts that the orphans' court properly rejected Appellant's argument that she knew about the 2010 Will because it was attached to the guardianship petition filed by Lori. *Id.* at 51 (stating that the guardianship petition "was filed by Lori's counsel, Lori verified the Petition alone, and only Lori is listed as the petitioner, which validates Lisa's claim that she had secondhand knowledge."). As the orphans' court explained,

> Lisa was aware of the existence of later Wills when she probated the 2008 Will [in 2015]; however, it was "secondhand knowledge" and, with the exception of the [] 2012 Will, she had never seen copies of them prior to [Decedent's] death. (N.T. 3/26-27/19, pp. 227-231). [Appellant's] argument that Lisa knew about the existence of the 2010 Will because it was attached to the Petition for Guardianship that "she" filed is factually incorrect. The Petition was filed by Counsel for Lori and Lori is listed as the Petitioner….
>
> Lisa's credible explanation is that she believed that the Decedent did not have testamentary capacity and was under the undue influence of [Appellant] at the time of execution of all the Wills prepared or executed after the 2008 Will; and thus, such Wills would not be valid. While Lisa may be correct in her position, it was not up to her to make that determination. Rather, such determination should have been made by the [c]ourt … in a different manner, [but] the end result is still the same—the Decedent lacked testamentary capacity on March 26, 2012.

OCO at 18-19.

As the record supports the orphans' court's findings and reasoning, we reject Appellant's claim that Lisa committed fraud by petitioning to probate the 2008 Will.

*Conclusion*

The evidence supports the orphans' court's factual findings and conclusions of law. Accordingly, the orphans' court did not err or abuse its discretion by invalidating of the 2012 Will and reversing the revocation of the 2008 Will.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

6/30/2026